**NASHUA CORPORATION, Plaintiff,**

v.

**NORTON COMPANY, Defendant**

**Norton Company, Third–
Party Plaintiff,**

v.

**Liberty Mutual Insurance Company,
Third–Party Defendant.**

**No. 90–CV–1351 (RSP/RWS).**

United States District Court,
N.D. New York.

June 26, 2000.

LeBoeuf, Lamb, Greene & MacRae, L.L.P., Albany, NY (Thomas S. West, Michael W. Peters, Cindy M. Monaco, of counsel), for Plaintiff.

Whiteman Osterman & Hanna, Albany, NY (Philip H. Gitlen, Carolyn Dick, Neil L. Levine, Steven T. Senior, of counsel), for Defendant and Third–Party Plaintiff.

Mackenzie Smith Lewis Michell & Hughes, Syracuse, NY (David M. Garber, Stephen T. Helmer, of counsel), for Third–Party Defendant.

POOLER, District Judge.[*]

## TABLE OF CONTENTS

Introduction ................................................................. 333

Procedural Background ....................................................... 334

Findings of Fact............................................................. 334

 I. Layout of the Site and History of Its Ownership ......................... 334
 II. Subsurface Conditions ............................................... 335
 III. History of Solvent Loss During Norton's Stewardship ................... 336

[*] Rosemary S. Pooler, United States Court of Appeals Judge for the Second Circuit sitting by designation as a United States District Court Judge for the Northern District of New York.

 A. Norton's Solvent Usage ........................................ 336
 B. Solvent Related Complaints and Responses ......................... 336
 IV. Nashua's Purchase of the Plant ..................................... 338
 V. Norton's Solvent Usage After the Sale ............................... 339
 VI. Nashua's Tenure .................................................. 339
 A. Solvent Usage ............................................... 339
 B. Nashua's Leaks and Spills ..................................... 340
VII. The Investigative Process .......................................... 341
 A. The B–1 Boring .............................................. 341
 B. EPA Notification ............................................. 341
 C. The Limited Cooperative Investigation ........................... 342
 D. The Dunn–Rust Investigation .................................. 342
VIII. Causation ....................................................... 345
 A. Nashua's Contributions to Site Contamination .................... 345
 B. Norton's Contribution to Site Contamination ..................... 346
 1. The Bear–Tex Premises .................................... 346
 2. The 1960s Leaks .......................................... 346

Application of the Law to the Facts ....................................... 350

 I. CERCLA ....................................................... 350
 A. Section 107 Claims .......................................... 350
 B. Section 113(f)(1) Claims ...................................... 351
 II. RCRA Claims .................................................. 355
 A. Propriety of a RCRA Claim .................................... 356
 B. Imminent Danger ............................................ 356
 C. Cost Recovery Under RCRA .................................... 357
 D. Injunctive Relief ............................................. 358
 E. Attorney's Fees ............................................. 359

Conclusions of Law ..................................................... 359

Appendix I—P–245: Sample Locations and Areas of Potential Releases .............. I

Appendix II—P–246: Ground Water Analytical Results ........................... II

Appendix III—P–247: Sewer Analytical Results .................................. III

Appendix IV—P–248: Soil and Soil Gas Analytical Results ......................... IV

Appendix V—P–250: Map of the Site and its Neighbors .......................... V

Appendix VI— Frequently Used Abbreviations ............................. VI

## DECISION AFTER TRIAL

## INTRODUCTION

Plaintiff Nashua Corporation ("Nashua") owns and operates a pressure-sensitive tape manufacturing facility in Watervliet, New York. From the 1930s until 1974, defendant Norton Company ("Norton") owned and operated the tape-manufacturing facility. In the mid 1960s, Norton's underground solvent transfer lines leaked, causing massive toluene and tolusol contamination. After discovering the spill, Norton replaced the underground lines and made clean-up efforts. However, pollution from solvents of the type Norton used persists in the soil and groundwater under the Nashua plant. Nashua claims that the pollution results directly from Norton's leaking pipelines and its later sloppy housekeeping in a portion of the property it leased back from Nashua after the sale (the "Bear–Tex Premises"). Norton argues that (1) the current contamination could not have resulted from its releases; (2) various spills and emissions during Nashua's ownership of the Plant caused the pollution; and (3) even assum-

ing Norton caused some or all of the contamination, it is not liable for Nashua's response costs because they are unreasonable and do not comply with governing law. After weighing the evidence submitted at trial and considering the parties' post-trial submissions, I conclude—for reasons discussed in detail below—that Norton must bear 90% of Nashua's response and clean-up costs.

## PROCEDURAL BACKGROUND

On August 31, 1989, the United States Environmental Protection Agency ("EPA") issued notice letters to both Nashua and Norton regarding their potential liability under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 *et. seq.* ("CERCLA"). P-23.[1] After initial cooperative investigation and negotiation, Nashua and Norton disagreed on the appropriate division of clean-up costs, causing Nashua to file this lawsuit on December 14, 1990. Nashua sought recovery pursuant to CERCLA and made a New York common law nuisance claim. *See* Dkt. No. 1.

In April, 1994, this court (McCurn, *J*) granted partial summary judgment rejecting Norton's claim that Nashua assumed liability for all the claims asserted in its complaint when it purchased the Site. *See Nashua Corp. v. Norton Co.,* 1994 WL 144251 (N.D.N.Y. Apr.18, 1994). In February 1995, Nashua amended its complaint to add a citizen suit claim under the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et. seq.* ("RCRA"). *See* Dkt. No. 108. On June 19, 1995, with trial scheduled to start on September 12, 1995, Norton moved for partial summary judgment dismissing Nashua's claim for diminished property value based on nuisance. I directed the parties to proceed to trial on

the liability issues and informed them that I would issue a decision on the permissibility of diminished value damages prior to any diminished value damages phase. The CERCLA/RCRA phase of the trial took place October 10 through October 25, 1995; December 5 through December 6, 1995; December 8, 1995, through December 15, 1995; February 12 through February 14, 1996; March 4 through March 6, 1996; and May 21 through May 22, 1996. On April 15, 1997, I issued a memorandum-decision and order dismissing Nashua's private nuisance claims as they related to spills at the Nashua Plant but allowing Nashua to proceed on public nuisance claims and private nuisance claims stemming from alleged polluting activities by Norton at the Bear–Tex Premises adjacent to the Nashua operation. *See Nashua Corp. v. Norton Co.,* 1997 WL 204904 (N.D.N.Y. Apr.15, 1997). The parties made their final post-trial submissions on August 5, 1997.

My findings of fact, analysis, and conclusions of law follow. Many of the findings of fact are based on stipulation or largely uncontroverted evidence. Where a serious credibility dispute exists, I will discuss my reasons for crediting the evidence offered by one party over that offered by the other either immediately or in my discussion of the expert opinions.

## FINDINGS OF FACT

### I. Layout of the Site and History of Its Ownership

From the 1930s to 1974, Norton owned and operated two manufacturing facilities, known as Plant 1 and Plant 2 in Watervliet. St. A-1; *see also* P-235. In Plant 2, the more western of the two, Norton man-

---

1. The following abbreviations are used throughout this memorandum decision and order: P(Plaintiff's Exhibit Number); D(Defendant's Exhibit Number); TT (Trial Transcript); Dep. Tr. (Deposition Transcript); St. (Pre–Trial Order, Stipulations, Dkt. No. 155 (these stipulations have both a letter and a number designation)); and FOF (Proposed

Findings of Fact). For the convenience of the reader, I have included several appendices containing reduced versions of frequently cited trial exhibits. They are Appendix I (P-245), Appendix II (P-246), Appendix III (P-247), Appendix IV (P-248), and Appendix V (P-250). Finally, Appendix VI is a glossary of frequently used abbreviations.

ufactured coated abrasives such as sandpaper. Norton manufactured pressure sensitive adhesive tape in Plant 1. St. A–2, A–3. The parties refer to the interconnected buildings of Plant 1 and the adjacent property as the "Site." St. A–5. In 1974, Nashua purchased Norton's tape manufacturing division including interconnected buildings 56, 56A, 58, 59, 60 and 61 in Plant 1 and adjacent land. St. A5, A7. Nashua then sold Building 56, the most northwestern of its buildings to Norton, which leased it to Donald Stone. St. A–7, P235. Around the same time, Nashua leased the northern half of Building 61, which occupies most of the northern portion of the Nashua plant to Norton. St. A–8. Norton used its portion of Building 61 for its Bear–Tex production line. St. A–8. Norton discontinued the Bear–Tex operation on December 20, 1989, and removed all its equipment from the site by March 30, 1990. St. A–12, A–13.

Two tank farms are situated to the north of Building 61 and near the north property line. St. A–14, P–245, Appendix I. Tank Farm No. 1, the eastern of the two, consists of four 20,000 gallon storage tanks and two 10,000 gallon storage tanks. St. B–15; P–245, Appendix I. Tank Farm No. 2 has two 20,000 gallon storage tanks. P–245, Appendix I. A quonset hut ("Quonset Hut No. 2") is located to the west of Tank Farm No. 1 near the north property boundary. *Id.* Other locations that figure in determining responsibility for contamination at the Site today are the filter room at the eastern edge of the Nashua plant, the solvent recovery room slightly to the southeast of the filter room, and certain roof vents in Building 58. *Id.*

The twenty-two acre Nashua Site is bounded by Norton Company to the west and residential areas to the east and south. P–235. The northern boundary is marked by a New York Central Railroad track. P–235; St. A–6. Another residential neighborhood known as Maplewood and consisting of Alden, Craig, and Archibald Streets and Lansing Avenue from south to north, Route 32 to the east, and a railroad track to the west lies to the north of the railroad track. P–235; P–250, Appendix V.

## II. Subsurface Conditions

The land underlying the Nashua Plant is heterogeneous and contains rubble, sand, gravel, and finely pored materials such as silt and clay. Pockets of finely pored materials can be found within larger deposits of sand and gravel. TT at 2695, 2976; P–198. I base these conclusions on a trial exhibit, P–249, created by Nashua that depicts a geological cross-section of the lands at the north of the site underlying Quonset Hut No. 2 and the two tank farms as well as on trial testimony. TT at 1935–36; P–249. Nashua's expert geologist created trial exhibit P–249 after examining boring logs that described soil types at the many locations where Nashua's consulting firm drilled into the soil for various purposes. Where no actual borings had been made, the geologist estimated soil type based on the nearest borings and general principles. Groundwater saturates much of the subsurface environment. P–198 at 7. The zone of saturation, known as the water table, is found at varying depths below the surface. *Id.* The water table fluctuates vertically in response to seasonal cycles and storms. *Id.* In addition, water flow direction varies over time. Although the ground water flows predominantly to the north and northeast, it includes, at least at times, a south or southwesterly component.[2]

Several storm sewers run under the plant, converge, and ultimately flow eastward into a municipal storm sewer. *Id.* These sewers include leaking clay pipe and corrugated metal pipe. *Id.* Two main west-east sewers cross the former location of the underground solvent lines. P–246,

---

**2.** The parties' experts differ on this issue and I discuss my reasons for reaching this conclusion below at 30, 32.

Appendix II. There are also sanitary sewers underneath the Site

### III. History of Solvent Loss During Norton's Stewardship

#### A. Norton's Solvent Usage

Each of the six tanks in Tank Farm No.1, which were installed by Norton in the mid–1950s, had a connection to an underground line that transferred solvent from the tanks to various manufacturing facilities within the plant. St. B–17, 22, 24; P–3, ¶ 79. Both Norton and Nashua—at various times—stored the solvents toluene and tolusol in the 20,000 gallon tanks and methyl ethyl ketone ("MEK") in the 10,000 gallon tanks. St. B–20–21. Tolusol is a combination of toluene and heptane. St. G–88. Norton used each of these solvents in its tape manufacturing process. St. B–20–B–26. A seventh pipeline led from a solvent recovery operation to Tank Farm No. 1. St. B–23. In 1961 or 1962, Norton installed a solvent recovery operation. St. D–47. Prior to that time, Norton emitted all of the solvent in vapor phase to the air. Hoyt Dep. Tr. at 10. In addition, Norton discharged decanter water from the solvent recovery lines to the storm sewer. Muller Dep. Tr. at 61, 176.

Former Norton employees, who became Nashua employees in 1974, testified concerning the volume of Norton's purchases of solvent. Arthur LaBreque had responsibility for either the requisition or procurement of solvents for Norton during the following periods of time: November 1969 to December 1972 and December 1973 to March 1974. TT at 231–235. He estimated that Norton purchased three to four tank trucks a week of solvent between November 1969 and late 1972 and that each truck load contained between 6500 and 6800 gallons of solvent. TT at 283–85. James Susko worked in quality control at Norton from the mid 1950s until 1972 or 1973. Susko Dep. Tr. at 5–8. He testified that Norton used toluene and tolusol as solvents and that Norton purchased between two and three tank loads of solvent

a week. *Id.* at 20–21. Assuming conservatively that Norton purchased an average of two and a half tank loads of solvent a week during the late 1960s and that each load contained 6650 gallons of solvent, Norton's average annual solvent consumption approximated 865,000 gallons.

#### B. Solvent Related Complaints and Responses

Beginning in the mid 1960s, Town of Colonie[3] employee Thomas Burke responded to odor complaints in the Maplewood neighborhood north of the Site. Burke noted "a strong chemical odor in the manholes along Alden St.," the street closest to the Site and a weaker form of the same odor in Alden St. residences. TT at 133,136. When Burke actually entered manholes in the sewers, the odors quickly made him dizzy. TT at 145. He also smelled a weaker chemical odor in the manhole on Craig St., to the north of Alden and stronger odors in the 3rd Avenue and 27th St. area to the east of the Site. TT at 145–47. Burke continued to respond to complaints in the Alden St. neighborhood until 1975. TT at 143.

Early in 1967, Norton received a complaint from Mutual Coal Co., located to the east of the Site, of a strong odor of solvent in its wash room. P–21; TT at 130; P–235. In response, Norton tested the decanter condensate water in its solvent recovery system and found that it contained 1% alcohol and an undetermined amount of toluene. P–21 at 4. In November 1968, The Town of Colonie Fire Department and Albany County Health Department responded to complaints of solvent fumes in sanitary and storm sewers along Alden St. P–18, P–19; P–94. Using an explosion meter to determine solvent concentration in manholes in both sewer systems, workers consistently found solvent fumes at explosive levels as far north as Alden St. P–19; P–94. During Norton's own investigation, employees witnessed solvent leaking into a sanitary system manhole at Alden St. P–

---

**3.** The Site is located in Watervliet and in the town of Colonie.

19. Norton confirmed the presence of toluene and tolusol in water from the sewers. P–18.

At some time prior to February 6, 1969, Norton conducted a "material balance study ... to determine if the amount of solvent received and recovered was the same as that which was used." *Id.* "Within the accuracy of the metering devices ... there was no evidence of solvent loss." *Id.* However, in November, 1969, at the request of Norton's accounting department, Arthur LaBreque investigated a $60,000 variance between solvent purchased by Norton from July 1968 to July 1969 and verifiable inventory. TT at 286–89. LaBreque found that Norton consistently lost about a tanker truck load of solvent a week. *Id.* Again using a figure of 6,650 gallons for a tanker truck load, the annual loss would have been almost 346,000 gallons.

At first Norton Personnel assumed that the escaped solvent came from the solvent recovery system decanter and installed a heat exchanger and water tower to flash the solvent out of the decanter effluent before it entered the sewer system. P–19. On January 15, 1969, Wilbur E. Kidder, Norton's industrial relations manager, wrote to Town of Colonie Chief Fire Inspector Howard C. Wilson to advise him of these steps but conceded that "there are still some puzzling factors such as the presence of toluene in the lines clear up in Craig Street, upstream from any drains in our plant." P–15. Kidder assured Wilson that Norton would pressure test its underground solvent lines. *Id.* On January 22, 1969, Kidder advised Wilbur that the pressure tests revealed "that one of our tolusol lines was leaking." P–16. In a subsequent internal memo dated February 6, 1969, R.L. Muller of the Engineering Department advised that three of the lines were porous and would not hold pressure. P–18 at 2. Muller requested approval to replace all the solvent lines "in order to prevent a reoccurrence of this hazardous condition which could have resulted in legal action by The Town of Colonie or the Albany County Department of Health, or in a sewer explosion if the vapor were ignited." *Id.* He further noted: "After the completion of this project, there will be no underground solvent lines in the plant which will preclude the possibility of future sewer contamination from this source. The piping will all be over the roof where by a visual inspection even the slightest leak can be detected and repaired." *Id.* Norton sealed off the underground solvent transfer pipelines, abandoned them in place, and installed overhead lines. St. E–69.

In late summer 1969—after the underground pipelines had been removed—solvent fumes ignited, blowing off storm sewer manhole covers inside and outside the northeast corner of Building 61 (at the northeast corner of the Nashua Plant). LaValley Dep. Tr. at 27–28; Mulheren Dep. Tr. at 174–75; Hoyt Dep. Tr. at 127; P–19. Norton excavated a section of the pipe inside Building 61 and found several inches of solvent floating on the water table under the building. P–19. Workers dug a test pit, dropped a hose into it, and pumped the liquid, a mixture of solvent and water, continuously until the pit was empty. St. E–79. Initially, workers repeated this process daily, and the amount of solvent in the pit decreased over time. St. E–81–82. This pit remained open from September 1969 to December 1970. P–19. When the workers stopped seeing any solvent at all, they let the pit stand for a week or so and then closed it. Muller Dep. Tr. at 99. About 3200 gallons of solvent, which Norton identified as tolusol, were recovered. P–19.

During the pumping process, Muller observed "that whenever there was an accidental spill of solvent at the tank farm, a corresponding increase in the thickness of the solvent layer would take place inside Bldg. 61 within 24 hours." P–19. To control this problem, Norton constructed a sealed concrete dyke around the storage tank farm and set up a procedure for pumping out the dyke when a spill occurred. *Id.*

Norton also excavated two other test pits—one to the west and one to the east of Tank Farm No. 1—and excavated them to the water table. St. E–70. Employees found solvent floating on the water only in the east test pit. St. E–71–73. The company left the east test pit open for two to three months and pumped water and solvent from it. St. E–74–75.

In 1971, The Albany County Sewer District ("ACSD") and Town of Colonie began to construct new sewer lines in the Maplewood neighborhood along Alden Street and Route 32. St. F–85, P–235; TT at 85. C.T. Male Associates, Inc. ("C.T.Male") was the engineer of record. TT. at 86. A subcontractor drilled a bore pit at a jog in the sewer underneath the railroad tracks, almost directly north of Tank Farm No. 2, and northwest of the former solvent recovery lines and Tank Farm No. 1. P–235, TT at 88. In the course of this excavation, the workers noted an odd odor in the bore pit. TT at 93. Soil excavated from the pit had the same odor. TT at 98. When the excavation was completed and workers attempted to cut a hole in some sheathing, sparks from an acetylene torch caused a fire on the water. TT at 93. The substance causing the odor and the fire also caused employees who inhaled it for substantial periods of time to become lightheaded. TT at 95–96. CT Male's supervising engineer, Thomas Vroman, observed a substance floating on the top of the water. TT at 97.

On Monday, November 22, 1971, men working in the sewer found the bodies of two other workers in the bore pit. TT at 92. Autopsies established that the two men, who had been missing since Friday, November 18, 1971, had toluene in their blood, brains, and lungs. P–49; P–50. The autopsies did not reveal any other toxic substance. *Id.*

The contractors returned to the job site shortly after discovering the bodies and continued to encounter solvent in the groundwater east of the boring pit, north of the railroad track and just south of Alden Street. TT at 102–105. Fire investigators found that toluene in manholes in the interceptor was at an explosive level. P–57; P–58. When the contractors attempted to weld a pipe to be used to carry a sewer pipe across Route 32 at Alden Street, the sewer ditch again caught fire. TT at 104–05. Some attempts were made to remove solvent from the sewer ditch, but the record does not indicate their effectiveness. TT at 105–06; P–65–66. All that is known is that by January 3, 1972, two hundred gallons of toluene had been collected. P–94.

## IV. Nashua's Purchase of the Plant

Nashua purchased the pressure-sensitive tape manufacturing division from Norton on February 24, 1974. St. A–7. Norton did not disclose the leaks from the solvent recovery line or the resulting contamination and deaths at the time of the sale. TT at 571–75, 603.[4] Nevertheless, Norton argues that Nashua should have known about the leaks because (1) Nashua, which already used solvents in some of its other operations and thus knew of their dangerous propensities, had access to all of Norton's business records prior to sale; (2) Nashua hired most of Norton's employees; and (3) Nashua employees conducted a physical inspection of the premises to assess safety and environmental issues, TT at 608; Potter Dep. Tr. at 68; D–120. In addition, the evidence establishes that Nashua knew that some solvent was escaping into the air because solvent recovery systems at the time were only about 85% to 90% efficient and certain emissions were not picked up in the solvent recovery system. Potter Dep. Tr. at 65–66. I con-

---

4. Joseph Mulheren, former production manager for Nashua, testified that he told a Nashua executive something about the 1960s releases but not about the deaths of the sewer workers. Mulheren's testimony was not per- suasive and does not alter my conclusion because the testimony is vague and Mulheren later admitted to making contradictory statements. TT at 1199–1200, 1209–10.

clude that although Nashua should have been and probably was aware that solvents likely contaminated the Site to some extent, no credible evidence supports the conclusion that Nashua either should have known or did know about the massive leaks in the 1960s.

## V. Norton's Solvent Usage After the Sale

Norton leased Building 61 for its Bear–Tex Operation, in which it continued to use solvents including methyl isobutyl ketone ("MIBK"), xylene, and toluene and tolusol in small amounts. O'Brien Dep. Tr. of 7/22/94 at 162–64; P–27; P–38; TT at 875–76, 2090. Norton dumped certain of these solvents including MIBK in the Bear–Tex sump pit. TT at 868–69. MIBK and toluene were found in the sanitary sewer effluent downstream from the Beartex sump pit. P–195 at 3. Norton also spilled solvents on pavement outside Building 61. P–27; O'Brien Dep. Tr. of 8/12/94 at 113. Norton replaced this area of pavement in September 1989 because of the deterioration caused by the spills. O'Brien Dep Tr. of 8/12/94 at 108–13. Soil samples in the area replaced contained MIBK. P–198 at 18, TT at 2090, 2144.

## VI. Nashua's Tenure

### A. Solvent Usage

The parties agree that Nashua initially used both toluene and tolusol in its tape manufacturing process but disagree as to when Nashua stopped using tolusol. St. G–87, 89. Norton contends that Nashua used tolusol or hepsol, another solvent that contains both heptane and toluene, until at least 1989. Norton FOF 60. Norton relies on (1) Nashua's 1982 and 1984 certificates to operate an air contamination source, which list heptane as a contaminant, D–17, D–23, D–24, D–25, D–26; (2) Nashua's waste data sheet dated February 20, 1986, which lists toluene and heptane

as constituents of adhesive waste, D–22; (3) an industrial chemical survey from September 1984 listing toluene and tolusol as hazardous waste, D–68; (4) a hazardous materials report from December 1984 listing toluene and tolusol, D–69; and (5) Nashua's interrogatory responses 65 and 66 concerning stack and fugitive emissions, P–203. Defendant also relies on Louis Ethier's testimony that, to the best of his recollection, Nashua bought a heptane blend until at least 1989, Ethier Dep. Tr. at 27–29,[5] and deposition testimony from Ralph Hoyt that Nashua used tolusol in 1984, Hoyt. Dep. Tr. at 121. At another point, however, Hoyt testified that Nashua used tolusol for only three or four years after it began operations in 1974. TT at 53. Some of the cited documents do not support Norton's position. For instance, the reference to tolusol vapors in D68 is limited to the period from 1961 to December 31, 1981. D–68 at 4. And, the cited interrogatory responses refer to toluene only. However, in 1984, Nashua did report that it had 7500 gallons of tolusol on the premises. D–69 at 2. Moreover, Nashua requested permission from DEC to operate an air contamination source in 1982 and 1984 and listed heptane as a contaminant. D–17, D–23, D–24, D–25, D–26.

Nashua claims that its use of heptane ended in late 1981 or early 1982. Nashua FOF 59. It relies in part on requisition sheets that show no purchases of heptane, tolusol, hepsol and RMT 825 and 825A (forms of hepsol) after 1981. P–112, P–112A, P–117A. In addition, Nashua's technical director during the late 1970's and 1980's, Paul Sartoris, testified that Nashua stopped using heptane for economic reasons around 1980. TT at 412–414. Arthur LaBrecque, who ordered Nashua's raw materials, testified that Nashua last purchased tolusol in February 1981 and last purchased Hepsol in August 1981. TT at 232, 273–276. Finally, Rick Lawton, who

**5.** Page 28 is missing from the deposition transcript furnished to the court. Pages 27 and 29 do not contain the date on which Nashua stopped using Tolusol. For purposes of this

discussion, I assume that page 28 was omitted as the result of clerical error and that Ethier testified as Norton represents.

became Nashua's manager of regulatory affairs in 1989, explained that when he renewed Nashua's permits in 1990, he found they were inaccurate in that they listed pollutants including heptane that Nashua no longer emitted. TT at 855–56. He therefore corrected the DEC printout and sent it back. TT at 856.

The more credible documentary and almost all the testimonial evidence supports Nashua's claim that it stopped purchasing and using tolusol and heptane in the very early 1980s although it continued to store tolusol thereafter. The witness who testified to Nashua usage after 1981 contradicted himself, and the witness who testified to purchases after 1981 was contradicted both by the documentary evidence and by the other witnesses. Although the permitting applications constitute some evidence that Nashua used heptane and/or tolusol after 1981, they are outweighed by the other evidence of record and were explained, at least in part, by Lawton's testimony.

*B. Nashua's Leaks and Spills*

The evidence established several leaks and spills during Nashua's operation of the Site. In 1983, a mechanical failure in the decanting area caused approximately 700 gallons of toluene to discharge to the sewer line leading to the Albany County Sewage Treatment plant. Moore Dep. Tr. at 21. Another such incident two or three years later resulted in a discharge of between 900 and 1288 gallons of toluene into the sewer system. *Id.; Compare* D–81 *with* D–234. After the second problem, Nashua agreed to corrective measures and to routine inspections by the sewer district.

In 1985, toluene being transferred from one tank to another in Tank Farm No. 1 overflowed. TT at 1528. A machinist notified plant managers including James Susko, and they immediately shut the pump down. *Id.* Susko went to the scene and observed solvent sliding down the outside of the tank and into the concrete bermed area. *Id* Within the next hour, Nashua pumped about 350 gallons of water and solvent from the bermed area. TT at 1528, 1534. Susko testified that he did not observe solvent on the ground or any place other than inside the berm and that the overflow pipe was too small to enable the solvent to escape the berm. Susko Dep. Tr. at 79–80, 198. Other spills from the tank farm also flowed into the concrete basin beneath the tanks. Ethier Dep. Tr. at 61. On examination in 1992, the concrete basin was pock marked and cracked, contained epoxy patches that had delaminated, and had standing water and solvent in it. TT at 1072–86, 1125; D–136–38. However the record does not indicate how deep the cracks were, and the presence of standing water suggests that the basin did not leak.

In April 1986, a backflush solvent release in the filter room inside the plant caused approximately 450 to 700 gallons of solvent (90% toluene and 10% solids), to drain onto the six-inch concrete floor of the filter room. Moore Dep. Tr. at 46–47, D–232. Most of the spilled material evaporated, but Nashua conceded that "it is possible that a small quantity of material leaked into a storm sewer drain and found its way to the Hudson River." D–232. However "[a] water sample ... taken at the storm sewer discharge point and in-house testing found no toluene contamination." D–232. Some of the toluene drained onto an asphalt area outside the filter room. Moore Dep. Tr. at 98–99. Nashua removed the contaminated asphalt. *Id.* at 112.

Malfunctions in the solvent recovery system during Nashua's ownership sometimes pumped solvent to the roof of the Solvent Recovery Room. Ethier Dep. Tr. at 72–76. Solvents reaching the roof ordinarily were bermed with Speedy–Dry, an absorbent, and left to evaporate, but on one occasion about 15–20 gallons escaped to an adjacent alley. *Id.* at 74–75. Nashua employees put Speedy Dry on this spill and left it to evaporate. *Id.* at 75–76. In addition, certain portions of the floor in the recovery room deteriorated from solvent

that dripped on it. D–129. Sometimes solvent was pumped out into the roadway adjacent to the Solvent Recovery System. Ethier Dep. Tr. at 72.

Norton identifies the solvent recovery decanter as another potential source of contamination. After water from the solvent recovery decanter went through the air stripper, Nashua discharged it to the sanitary sewer, which flows off Site and ultimately to the Albany County Sewer District. Susko Dep. Tr. at 126–27.

Nashua also produced both stack and fugitive emissions of toluene. P–203, Interrogatory Responses 65, 66.

Finally, Norton identified Nashua's storage practices as a potential source of a release to the subsurface environment. Various historical documents demonstrate a certain sloppiness on Nashua's part in storing chemicals in and around Quonset Hut No. 2. See D–10 (April 18, 1986, memo stating that "several" of the approximately 500 "empty" drums stored mainly outside the quonset hut "had a small quantity of product left in the drum"); D–11A (September 10, 1986, hazardous waste meeting minutes stating that although "overall condition of hazardous waste accumulation and storage was very good," the drums in Quonset Hut No. 2 were in questionable condition); D–45 (internal memo dated May 13, 1986, noting storage of "numerous drums, pails, etc. of resins, solvents, oils, and unknowns throughout the plant); D–46 (internal memo dated April 22, 1987, noting that empty drums had been stored in the quonset hut on their sides and were leaking onto the floor"); D–65–66 (inspection log and checklist showing one leaking drum outside Quonset Hut No. 2); D–229B (March 11, 1986, inspection log noting, "40+ drums, open, seeping saturant on ground outside hut . . . . 200+ drums (partially filled) of hard latex outside"); D–229C (inspection log dated March 26, 1986 stating that waste latex drums were stored outside Quonset Hut No. 2). Much of the hazardous waste stored in drums including latex, junk adhesive, banbury waste, stripper waste, waste oils, oily filters and rags,

and floor cleaning and debris contained toluene, ordinarily in extremely low concentrations. D–89 (list of waste streams); TT at 1409–15. Nashua closed Quonset Hut No. 2 in June 1988. P–130; P–131 at 2.

## VII. The Investigative Process

### A. The B–1 Boring

In 1988, Nashua wished to erect a calcium carbonate storage silo. St. H–95. To determine the suitability of the proposed area for a storage silo, Empire Soils conducted a geotechnical investigation. Id. The company drilled a test boring (Empire B–1) at the northwest corner of Tank Farm I and east of Tank Farm II and Quonset Hut No. 2. St. H–96; P–235. At a depth of ten feet, Empire Soils encountered groundwater, smelled a solvent odor, and found a 13–inch thick layer of solvent floating—within a hollow stem augur—on the top of the water table. St. H–97–98; D–169 at 2; P–153. A Nashua analytic chemist analyzed a sample from the boring and found that the majority of the sample was toluene with some heptane. Ellett Dep. Tr. at 8, 19, 22. Nashua did not report these results to EPA or the New York State Department of Environmental Conservation ("DEC"). TT at 476–79, 516–17. Nashua's in-house counsel, Arthur Lyman, explained that he believed no new spill had occurred and that the contamination resulted from Norton's 1969 spill. TT at 516–17. Lyman did contact Hank Jackson, Norton's in-house lawyer, who told Lyman that all appropriate authorities had been contacted at the time of the 1969 spill. TT at 517–19.

### B. EPA Notification

On August 31, 1989, EPA notified Norton and Nashua of their potential CERCLA liability for contamination outside Building 61. P–157; TT at 520–21. EPA took this action after Stone Management, a property owner to the west of Building 61, complained of an odor or discoloration in storm water at its facility. TT at 520–21;

O'Brien Dep. Tr. of 7/22/94 at 153–154. Prior to issuing the notices, EPA and DEC, which became the lead agency in the investigation, had limited sampling results suggesting the presence of volatile organics, metals, and petroleum hydrocarbons in the storm water and/or storm water sediment. P–160 at 7.

### C. The Limited Cooperative Investigation

Norton and Nashua jointly hired ERM Northeast, an environmental engineering firm, to conduct an investigation of the Site. O'Brien Dep. Tr. of 7/22/94 at 154. ERM's October 24, 1989, final report found three areas of potential contamination—the solvent recovery room in Building 59, the Bear–Tex Premises, and the tank farms (with particular reference to the 1960s leaks). P–162 at 5–9–5–11. ERM recommended further investigation of subsurface conditions in areas surrounding Building 61, the solvent recovery area, and the tank farms. *Id.* at 7–3.

On March 5, 1990, Nashua demanded that Norton assume the costs of Site investigation and clean up. P–231. Norton offered to split the cost of the clean-up equally, but Nashua declined. P–231; D–269; TT at 1230–32.

### D. The Dunn–Rust Investigation

In October 1989, Nashua retained Dunn Geoscience ("Dunn"), which later became RUST Environmental & Infrastructure, Inc. ("RUST") (collectively, "Dunn/RUST"), to conduct further site investigations. TT at 845–46, 1429. Dunn/RUST, in consultation with DEC officials, amended the ERM work plan. TT at 1429–30, 1768. Frank Williams, Dunn's Senior Project Manager and a Nashua expert at trial, outlined the scope of the subsequent investigation. Based on ERM's work and its own, Dunn/RUST identified several areas of potential release of solvents including the two tank farms, Quonset Hut No. 2, the Bear–Tex sump and doorway spill areas, the filter room, the solvent recovery area, roof vents in Building 58, and the former underground solvent transfer lines,

which ran from the tank farms into Building 61. P–245. The company then planned sampling to address these potential release areas. TT at 1815–16. In essence, Dunn/ RUST looked for the presence of solvents at locations close to areas from which the solvent might have migrated into the subsurface environment. The principal solvents at issue—toluene and tolusol—are both non-aqueous phase liquids ("NAPLs"), or liquids that are immiscible in water. They are also light non-aqueous phase liquids ("LNAPLs") or lighter than water liquids that tend to float on top of the water table. TT at 3113; P–198 at 7–8.

In their earliest soil testing, Dunn/ RUST personnel drilled test borings ("TB") one through seven along the northern and eastern borders of the Site, and, with one exception, found low levels of toluene. TT at 1834; P–248, Appendix IV. At TB–5, located at the north of the property to the immediate west of Tank Farm No.1 and northwest of the former solvent recovery lines, the researchers "observed a sheen on the soil which was indicative of a nonaqueous-phase liquid ("NAPL") . . . in the area of the water table roughly about 8 to 10 feet below surface." TT at 1834. Laboratory testing showed that the sample had "very elevated levels of heptane and toluene relative to the other borings at this location." *Id.; see also* P–248, Appendix IV.

Dunn/RUST also performed an initial round of groundwater testing using five wells that rimmed the perimeter of the plant. None of these wells—DGC–1 at the southwestern corner of the site; DGC–4, the most northwestern of the wells, located slightly to the west of Quonset Hut No. 2; DGC–5, also at the northern edge of the plant and slightly to the east of Tank Farm No. 1; DGC–3 on the eastern side of the plant slightly northeast of the filter room and also northeast of the solvent recovery room; and DGC–2, southeast of the solvent recovery room—had measurable toluene or heptane in samples drawn in

December 1989. P–246, Appendix II; TT at 1835. The researchers were surprised by these results because TB–5 had such a high level of toluene that they anticipated significant results at all locations down gradient of that boring. TT at 1835.

Dunn/RUST also received early storm sewer analytical results for manhole 3, located south of Quonset Hut No. 2 and the two tank farms, roughly equidistant from tank farms 1 and 2; manhole 12 in Building 61, southeast of the Bear–Tex Sump and doorway and west of the former solvent transfer line; and manhole 6, east and south of the solvent recovery room and east and north of the filter room. P–247, Appendix III; TT at 1835–36. Dunn/RUST found no or very little toluene and heptane in the water from each of these locations. There were higher levels of the two chemicals (and other NAPLs) in the sediment because NAPLs have a greater affinity for soil than water. TT at 1836. Early analytical results for MH–FC and MH–1, both located on the sanitary sewer trending south from the Bear–Tex Premises, "were significantly different," showing "some toluene" and "quite a few other chemicals" such as "MIBG, methyl isobutyl butane, MEK, methyl ethyl ketone; styrene, and in one instance some 1.4 dichlorobenzene." TT at 1836; P–247, Appendix III.

After receiving these early results, Dunn/RUST submitted a report to DEC and, in consultation with DEC, agreed on additional work. TT at 1837. The new work included a soil gas survey in the vicinity of TB–5 to determine how far the contamination had spread and some additional water levels in the monitoring wells. TT at 1838. Dunn hoped to establish the direction of ground water flow through the water levels. *Id.*

The soil gas survey involved "collecting small amounts of the air … in the soil … about two or three feet below the surface" and analyzing it in a field gas chromatograph. T–1843–44. Although the field gas chromatograph allows for immediate results, it has limitations in identifying specific NAPLs. TT at 1850–51. Therefore, Dunn/RUST used it principally to identify the total concentration of volatile organic compounds ("VOCs") in any particular sample. TT at 1851. VOCs include volatile solvents such as heptane and toluene. TT at 1720. In addition, the type of soil influences the ability of the ground to deliver air to the field gas chromatograph, with air being more easily extracted from loose soil such as gravel than from tight soil. TT at 1852–53. Consequently one cannot conclude that contamination is not present at a particular site from negative results at that location.

June 1990 soil gas testing focused on the area around the TB–5 boring, the area below Building 61's concrete floor, an area just east of manhole MH–1 along the sanitary sewer line, and bedding adjacent to the storm sewer line east of manhole MH–5. TT at 1855–56. High levels of VOCs near the northern property line and surrounding TB 5 concerned DEC representative Margaret O'Brien, so she asked Dunn/RUST to take measurements "off the property to the north of the facility along the railroad tracks." TT at 1855. Dunn/RUST took four additional samples north of the railroad tracks and off the Site and did not find contamination. In general, Dunn/RUST found elevated levels of VOCS "in the general area around the tank farm and just to the south of it." TT at 1856; P–248, Appendix IV. However, there were also some negative results in this area. *Id.* There were very low readings or non-detectible readings at the points outside the manholes where contamination had been detected. TT at 1858.

In mid July 1990, discovery of contamination in Building 58 interrupted the planned testing. TT at 1858; P–248, Appendix IV. Under Frank Williams' observation, Dunn/RUST's geotechnical department conducted geotechnical borings. TT at 1859–60. Dunn/RUST made the first borings, shown on P–245 as B–1, B–2, and B–6, in the southwest area of Building 58. TT at 1859, P–245, Appendix I. Northwest

of this area, they dug borings B–3 through B–5. Dunn/RUST discovered contaminated soil at B–1 and extremely elevated levels of VOCS at B–3. TT at 1861. As it turned out, B–1 was contaminated with a very old fuel oil. TT at 1862. However, the results from B–3 "indicate[d] very elevated concentrations of heptane and toluene." TT at 1864; P–248, Appendix IV. Later soil gas samples in the area also indicated high levels of VOCS. TT at 1865, P–248, Appendix IV.

Dunn/RUST reported all these results to DEC and during the remainder of the summer formulated an additional work plan. TT at 1866. After reaching agreement with DEC on the plan, Dunn/RUST implemented it in October 1990. TT at 1867. Pursuant to the plan, the company installed three new monitoring wells in the vicinity of TB–5: DGC–6 inside Building 61, just west of the former solvent transfer line; DGC–7, just west of Tank Farm–1; and DGC–8, just north of Tank Farm 1. TT at 1868; P–246. Dunn/RUST also took a deep soil boring just north of the Beartex Sump and Doorway spills. *Id.* Finally, the company installed wells DGC–9 and DGC–10 toward the northeast of the property to monitor PCB-contamination for a matter unrelated to the toluene/heptane investigation. *Id.*

Groundwater sampling conducted in November 1990 revealed elevated concentrations of toluene in each of the new wells (DGC–6, DGC–7, and DGC–8) installed around TB–5. P–246, Appendix II; TT at 1870. Dunn/RUST also sampled all the pre-existing wells as well as DGC–9 and DGC–10 and found no evidence of toluene or heptane in these wells. *Id.* Williams testified that although the analytical results at DGC–7 did not show detectable levels, heptane likely was present in the groundwater because it was present in the adjacent soil. TT at 1882–83. He indicated that "[m]olecules of heptane are constantly leaving the adsorbed phase [in the soil] and dissolving into the groundwater and they are constantly going from the dissolved phase in groundwater back to the adsorbed phase .... There is an equi-

librium established there." *Id.* Williams also believed that DGC–8 contained heptane at the time of the 1990 tests based on later tests performed by Dr. Joseph Comeau. TT at 1885–86; *see* below at 22–23.

Dunn/RUST reported the results of this round of testing to DEC in January 1991. TT at 1886. Thereafter, there was a hiatus in investigatory activity while Dunn/RUST assessed the relative appropriateness of the RCRA and CERCLA programs for the Site. TT at 1888. Dunn/RUST evaluated the work that would be required under each program, estimated its cost, and evaluated clean up standards. TT at 1890. On June 4, 1993, Dunn/RUST sent Luanne Whitbeck, O'Brien's successor at DEC, a plan for work under the RCRA program. P–179; TT at 1892. DEC requested a more definitive work plan but approved the concept of the RCRA plan. TT at 1896–97; P–178. Dunn/RUST completed the work plan in November 1993 and transmitted it to Norton. TT at 1901–03. The record does not indicate that Norton objected to the proposed work plan.

In December 1993, Norton's consultant, Eder Associates, conducted groundwater sampling and gave Dunn/RUST splits of their samples. Toluene was detected at DGC–6 and DGC–7. TT at 1921–22; P–246, Appendix II.

DEC gave Dunn/RUST comments on their work plan on December 29, 1993. TT at 1923. In April 1994, Dunn/RUST submitted the revisions that DEC requested along with a work safety plan. TT at 1923–24. DEC responded with additional comments and requests for information in August of 1994. TT at 1925. In late October 1994, DEC requested more information, TT at 1928; P–191, which Dunn/RUST supplied on January 20, 1995. TT at 1929; P–195.

In August 1995, Dr. Joseph Comeau tested groundwater from DGC–8, using a more sophisticated methodology than had been used previously, and found both tolu-

ene and heptane.[6] TT at 1932; P–196; P–246. Comeau performed his analysis to test the validity of Williams' opinion that heptane present in the ground water at DGC–8 evaded detection under the less sophisticated analytical protocol. TT at 640–43.

## VIII. Causation

In assessing the cause of the contamination found at the Site today, I rely on the analytical data from the Site, the geology of the Site, and the expert testimony. Because each party stipulated to the other party's experts' qualifications, St. C–6, and Norton stipulated to the validity of Dunn/RUST's analytical data except for the August 1995 results from DGC–8 and all data from DGC–1, I will review the experts' credentials only briefly. Frank Williams and Dr. Gerald Lauer testified for Nashua. Williams, a geologist, has substantial experience in site investigations including work on the Love Canal. TT at 1681–1688. Lauer is a limnologist who also has extensive site investigation experience and is knowledgeable concerning the effect of water supply contaminants on water supplies. TT at 2656–2674. Norton's experts were William Warrren and Dr. Olin Braids. Warren, a hydro geologist, has been performing site investigations since 1984. TT at 3024–25. Braids, whose academic background is in soil chemistry, has investigated areas of hazardous waste contamination since the early 1970s. TT at 3553, 3557.

### A. Nashua's Contributions to Site Contamination

Braids conceded that all but one of Nashua's spills and leaks could not account for the contamination found in Williams' investigation. TT at 4009–10. The sole exception to Braids' concession was the mid–1980s tank farm overflow. Because Warren made similar concessions, TT at 3402–03 (knows of no Nashua releases between 1990 and 1993), 3412 (filter room spill would not have led to significant sub-surface contamination), 3416–17 (spills from solvent recovery area could not have accounted for contamination at B–3, DGC–6, DGC–7, DGC–9 or TB–5), 3417–18 (no experience that would lead him to believe fugitive or stack emissions caused contamination of site), 3388–89 (Norton attorney's representation that Warren has nothing to offer concerning cause of contamination other than hydro geological conditions) and Nashua's experts testified persuasively that for several reasons, Nashua's spills and leaks did not cause the contamination found on the Site, TT 2073–2135 (Williams); TT 2780–2791 (Lauer), the only controverted potential release into the subsurface environment is the mid 1980s tank farm overflow. Braids' claim that the tank farm overflow could have caused the contamination detected at the Site rests on his assumption that solvent came out in a trajectory and "some" escaped the berm. TT at 3870–71. This speculation contradicts the competent evidence in the record. Susko testified that he observed no solvent on the ground and that the size of the overflow pipe was calculated to keep solvent from overflowing the berm. I therefore find that Nashua's identified spills and leaks did not contribute to the identified contamination at the Site.

However, Braids also testified that the contamination likely was attributable to an aggregate of small unreported spills on Nashua's watch. Although Braids could not identify a leak or spill during Nashua's tenure that (a) contained heptane or (b) could have caused the contamination identified at the site, it was his experience from other facilities that leaks and spills sufficient to cause the contamination at issue here often went unreported. TT at 3873. Braids' testimony concerning unreported spills is speculative and unrelated to any foundation concerning Nashua employees' work habits or reporting practices. I therefore reject it as insufficient

6. Comeau's data was the subject of a motion *in limine* as it was produced shortly before the scheduled start of trial. Based on Nashua's agreement to produce Comeau for a de-position and both parties' understanding that data gathering from the Site was an on-going process, I denied this motion. Minute Entry for September 28, 1995, Dkt. No. 162.

to support a finding that any Nashua spill, leak, or poor housekeeping practice caused the contamination that Dunn/RUST identified at the site and find that Nashua is not responsible for the identified contamination on site.

I do find, however, that Nashua is jointly responsible with Norton for a potential area of contamination under the solvent recovery room. Williams conceded that chronic dripping of organic condensate in the plumbing of the solvent recovery room during the Nashua and Norton eras probably contributed to some solvent contamination in the top inch or two of soil immediately beneath the solvent recovery room. TT at 2111–13, 2143.

### B. Norton's Contribution to Site Contamination

#### 1. The Bear–Tex Premises

Williams and Lauer testified that Norton's practices at the Bear–Tex premises caused contamination immediately outside the Bear–Tex Premises and in the sewer line leading south from the premises. TT at 2090–92, 2750–51. Norton did not controvert this testimony and did not submit any proposed findings of fact concerning the Bear–Tex Premises. I therefore find that Norton is responsible for contamination in these areas.

#### 2. The 1960s Leaks

Norton concedes that the 1960s leaks occurred but hotly disputes the persistence of solvent from those leaks at the levels and in the locations revealed by Dunn/RUST's testing. In assessing the likelihood of persistence of the 1960s contamination into the 1990s and beyond, I examine first the extent of the leaks. Williams characterized the leaks as massive relying on the following facts. Leakage from three lines persisted at least from the first complaints of solvent odor in the Maplewood area in 1966 until Norton's removal of the lines in January 1969. TT

at 2004, 2009. This leakage was continuous because centrifugal pumps remained on at all times. TT at 2010–12. Moreover, solvent spread over a large area. TT at 2015–24. Finally, according to Williams, LaBrecque's testimony showed a loss of 200,000 gallons of solvent in a six month period. TT at 2044–45. Lauer used a different methodology to determine the extent of the leaks. He estimated two different areas that the spill may have covered by (1) hypothesizing a circle with a radius extending alternatively from the southern and northern ends of the solvent transfer line to Craig St., (2) assuming that the average thickness of mobile LNAPL[7] was half an inch within that circle, (3) making certain assumptions concerning soil porosity based on the geological data in the record, and (4) assuming that certain areas of the circle would not be saturated because of the prevailing water flow in the area. TT at 2738–40. Assuming that the leaks occurred at the northern ends of the solvent transfer lines, Lauer estimated that the mobile LNAPL in the site to have been approximately 94,000 gallons and the residual LNAPL to have been approximately 408,000 gallons. TT at 2747. Lauer testified that larger amounts of LNAPL would have remained in the soil and groundwater if the leaks occurred at the southern end of the lines or the whole circle was saturated. TT at 2738–2746.

Although Braids maintained that he did not need to know how far the LNAPL spread to determine whether the remaining contamination at the Site resulted from Norton's leaks, TT at 3671, he estimated the spill at between 26,400 gallons at the low end and a million gallons at the high end, TT at 4011. Braids' figures referred to the amount of LNAPL in the ground at any one time, not the entire volume of the spill. TT at 4012. Braids did not explain his methodology at trial. I find, based on the LaBrecque testimony concerning the

7. Mobile LNAPL is LNAPL that is floating and moving along the groundwater elevation. Residual LNAPL is the LNAPL that remains trapped in the soil that the groundwater permeates. TT at 2733–38.

large amount of solvent unaccounted for in a very short period of time, the duration of the leaks, and the spread of the solvent, that the leak was indeed massive and almost certainly exceeded 500,000 gallons.

The parties also agree that a portion of the mobile LNAPL left the Site and surrounding areas via the storm sewers, the 1969 recovery pits, the sewer interceptor trench, and the 1971 recovery efforts. The difference here is one of emphasis. Braids testified that the west-east trending storm sewers and regional ground flow were extremely effective in removing mobile LNAPL from the site. TT at 3671–72; *see also* P–200 at 7–8; D–311. Lauer, however, pointed out that (1) there is little factual data to confirm that LNAPL entered the sewers continuously or at many locations; (2) much of the solvent obviously escaped the influence of the storm sewers because it could not have reached both the Maplewood area and former Test Pit E in Building 61 between the two sewer lines without crossing one or both of the storm sewers; (3) while the storm sewers were above the water table, solvents could not have leaked into them; and (4) at least a portion of the storm sewer, which Lauer observed, was made of steel rather than clay and thus was less subject to infiltration, TT at 2712–13. Braids also placed more emphasis on the 1969 and 1971 recovery efforts than did Lauer and Williams. Despite these differences in emphasis, Nashua's experts did not controvert Braids' bottom line conclusion that the mobile LNAPL largely had left the site by the by the mid 1970s. TT at 3671–76. I find that most of the mobile LNAPL exited the site by 1975 but that because of the duration and volume of the spill as well as the heterogenous subsurface environment which contained many soils that would tend to retain solvent, a large amount of residual LNAPL remained in the subsurface environment.

In determining whether toluene and heptane present in the soil and ground water under the Site today results from the 1960s release, I must assess the effectiveness of natural processes to remove the remaining residual solvent from the site as well as the probability that the contamination remaining on site and detected in Williams' investigation resulted from the leaking underground solvent lines. The second issue depends in part on the first because if natural processes removed all the contaminants from the site, the current contamination could not be Norton's. However, Norton also contends that the patterns of contamination present at the site today are inconsistent with what would be expected from a massive discharge and more consistent with various unspecified housekeeping lapses on Nashua's part.

Braids testified that the residual concentration of solvent on the site dissipated in three principal ways: volatilization, which turns liquid into gas thus dissipating it; dissolution, which dissolves molecules into water and carries them away; and degradation in which bacteria "eat" the solvents. TT at 3677. Nashua's experts conceded that dissolution would remove some of the contamination from the site although they noted that the combined effect of the two chemicals' relatively low solubility and the lack of kinetic energy under the site would retard dissolution. TT at 2066 (Williams), 2765 (Lauer). The Nashua experts also vigorously contested the efficacy of the other two methods based on conditions at the site. They testified that (1) the pavement under the site as well as the heterogenous soils, which trap LNAPL, would minimize volatilization, TT at 2066 (Williams), 2764 (Lauer); (2) a lack of nutrients such as phosphorous and nitrogen necessary for bio-degradation would prevent that process, TT at 2068 (Williams); (3) because of the pavement, the subsurface environment lacks oxygen, which also is necessary for bio-degradation, TT at 2068 (Williams) and (4) the high concentration of toluene and heptane at the site initially would have been toxic to the very bacteria that feed on lower concentrations, TT at 2068 (Williams). Braids conceded volatilization would play only a small role in cleansing the site but contended that some volatilization would occur because the Site is not hermetically sealed. TT at

3684–85. Norton's experts testified that probably there was some oxygen under the site both because rain water would bring oxygen and because the boring logs did not reflect mottling or hydrogen sulfide, which ordinarily are present in the absence of oxygen. TT at 3119–20 (Warren), 3701 (Braids). However, Warren conceded that he had no way of knowing whether there was enough oxygen to support bio-degradation and that the buildings and pavement at the site would reduce the available oxygen. TT at 3341–42. Braids also conceded that he did not know whether the necessary nutrients were present but believed that they were based on literature and personal experience concerning similar sites. TT at 3701.

In addition to positing that the solvent it leaked dissipated long ago, Norton offers four reasons that the contamination currently at the site could not have resulted from the 1960s leakage. First, Norton's experts contended that contamination from the 1960s could not have migrated to Boring B–3 in Building 58, southwest of the former solvent transfer lines, because that location is up gradient on the water table from the point of release "and you would not have that type of movement up that distance up gradient at this site." TT at 3503 (Warren), 3749 (Braids). Second, they testified that if the solvent contamination found in the 1990s resulted from the 1960s release, one would expect to find similar readings of contaminants nearby. TT at 3108–09 (Warren), 3734–35 (Braids). Third, Braids also testified that solvent levels in the wells would not vary as drastically from reading to reading if they resulted from the 1960s release. TT at 3741–45. Finally, Braids contended that the relative toluene and heptane concentrations at DGC–8 were inconsistent with those that could be expected from a tolusol leak although he also acknowledged that if both toluene and tolusol leaked, one would find different ratios of the two materials and that the ratio of toluene and heptane at TB–5 approximated those of tolusol. TT at 3900–01.

In concluding that the contamination of boring B–3 by the 1960s release is inconsistent with the water table gradient, Braids and Warren relied on Warren's belief that the water table tilted predominantly to the east and northeast and had no component of flow to the south or southwest at any point south of the southernmost of the two west-east storm sewer lines that traverse the former solvent recovery lines. TT at 3078, 3084. Warren, in turn, did not consider 1990 data from DGC–1, located in the southwest corner of the Site, that tended to show a south/southwesterly flow because, in his opinion, (1) the DGC–1 1990 data was anomalous and (2) the filter on DGC–1 might well have been clogged with silt. TT at 3095, 3310. Warren also acknowledged that he had reviewed maps of areas adjoining the site which showed water flows different from north/north-east, but that he did not consider them because he knew nothing about the conditions under which they were created. TT at 3177–79, 3184.

Williams and Lauer strongly differed with Norton's experts' claim that the isolated findings of contamination and/or the fluctuating levels of contamination indicated that the contamination could not have resulted from the leaking solvent transfer lines. Both testified that isolated hot spots were consistent with the way the contamination spread, because a massive spill such as this one would spread through the heterogenous soils of the Site via ganglia, with the solvent preferring the more porous soils. TT at 2142–43, 2736–37. Lauer also testified that differences in results for the wells on different sampling occasions was typical. TT at 2772–73.

Because the proof does not conclusively establish certain Site conditions—e.g. how much oxygen, nitrogen and phosphorous are present under the Site—I cannot conclusively determine how rapidly natural processes have reduced or will reduce the contamination to non-detectable levels. Nevertheless, I conclude for three principal reasons that natural processes had not

reduced contamination to undetectable levels by the early to mid 1990s when Nashua conducted its investigation.

First, although all of the experts testifying had experience with contamination by solvents, none testified to personal familiarity with a site where a spill as large as this one disappeared within thirty years. Instead, the testimony on actual sites tended to show solvents such as heptane and toluene persisting for decades. *See* TT at 2671–74 (Lauer description of Nepera Chemical Manufacturing site in Harriman, New York where releases of chemicals including toluene in the 1940s and 1950s caused substantial contamination that is still present today); 3130–40 ( Warren describing several long-lasting releases of benzene, a chemical similar in make-up to toluene); TT at 3936 (admission by Braids that he testified in *Superior Air,* a 1989 case, that after 20 years, zero to one percent of the toluene at a site would have bio-degraded); TT at 3821–22 (Braids' testimony concerning the Resorts International site where pollution of benzene, toluene, xylenes, and acetone in the 1960s persisted until cleaned up in 1990 and 1991). Although Braids claimed that more recent scientific articles indicated a much more rapid rate of bio-degradation, he pointed to no actual sites that he had investigated where all detectable remnants of a massive spill of similar LNAPLs into a similar environment disappeared within 30 years. TT at 3936.

Second, the Nashua experts' testimony concerning the factors that would impede bio-degradation and volatilization was persuasive. Although Norton undoubtedly is correct in suggesting that there is some oxygen under the site and may be correct in suggesting that some necessary nutrients are present, logic compels the conclusion that the pavement interferes both with volatilization and with the oxygen necessary for biodegradation.

Finally, the massive nature of the original release, which Norton's experts chose to ignore, suggests that major concentrations of solvent, toxic to bacteria, delayed the beginning of bio-degradation for a long time. Thus, I conclude that natural processes had not reduced the residual LNAPL at the site to non-detectable levels at the time of Dunn/RUST's investigation.

Next, I turn to Norton's contention that the Norton leaks could not have contaminated the B–3 boring in Building 58 because B–3 is southwest of the solvent transfer lines. This contention requires acceptance of Norton's interpretation of the well data. In eliminating a southern or southwestern element to the ground water flow, Norton's experts rejected the results from DGC–1 and other water maps without articulating a persuasive, scientifically acceptable reason for doing so. That the data did not fit in with other data on the site is not an acceptable reason. Nor—in the absence of proof which Norton did not offer—is speculation that the wells may have become clogged. In addition, the B–3 boring contained large quantities of heptane. Because heptane is a component of tolusol, one of the solvents that Norton leaked in the mid–1960s, and Norton offered no proof that Nashua leaked tolusol or any other heptane-based product, the presence of heptane suggests that the contamination resulted from the Norton leaks.

Norton also contended that the contamination resulted from discrete smaller spills rather than the massive 1960s discharge because (1) the contamination today is restricted to three discrete areas—north of the tank farm as reflected in TB5, DGC–7 and DGC–8, the B–3 area in Building 58, and DGC–6 in Building 61 parallel to and just east of the solvent recovery lines; (2) similar levels of contamination were not found nearby; and (3) there is nothing unique about the areas in which contamination was found to suggest that they would preferentially attract or trap LNAPL This argument is not persuasive. First, other areas of soil were contaminated by toluene, heptane, or unspecified VOCS—albeit in lower concentration—in reasonable proximity to each of these ar-

eas. *See* P-248. Second, there is no particular reason to credit Braids' testimony that the pancake spread of solvent would result in an even layer of contamination throughout the site over Lauer's and Williams' testimony that ganglionic migration could result in hot spots and cold spots in close proximity. If anything, Braids and Warren's testimony must be viewed with some suspicion because, as Warren admitted, their failure to take the entire spread of the solvent into account may have been somewhat misleading to the court. TT at 3255–61.

Nor do the differing levels of toluene (and with respect to DGC–8, heptane) in the wells at various times support Norton's position. Heptane again is the key to this issue. Nashua last ordered heptane in early 1981. Therefore, heptane is inconsistent with a recent release and must have persisted from a much older release. Because there is no proof that Nashua introduced any heptane into the subsurface environment, the likelihood is that the heptane and toluene found in the sampling areas on site—other than the Bear–Tex Premises—resulted from the 1960s leakage, and I so find.

In addition, contamination in the doorway spill area outside Building 61 and the Beartex sump resulted from Norton's operation of its Beartex Line. The parties both caused any contamination that may be found under the solvent recovery room.

As to the remainder of the site, Norton argues that Nashua failed to prove that any other contamination that may be found resulted from the underground solvent lines. I disagree. The only proof of any significant contamination that did or would effect the subsurface environment (apart from the Bear–Tex Premises and the Solvent Recovery Room) was proof of the solvent recovery line spill. In addition, Nashua established that water flow under the Site differed from time to time and that the solvent transfer lines spill was massive. Therefore, the proof establishes that Norton is principally responsible for

contaminating the Site with toluene and heptane.

## APPLICATION OF THE LAW TO THE FACTS

Nashua's amended complaint contains claims pursuant to § 107 of CERCLA, 42 U.S.C. § 9607, § 113 of CERCLA, 42 U.S.C. § 9613, and Section 7002(a)(1) of RCRA, 42 U.S.C. § 6972(a)(1). The amended complaint also contains a nuisance claim, which will be tried later pursuant to the parties' stipulation. Norton's answer to the amended complaint pleads RCRA and CERCLA counterclaims.

## I. CERCLA

### A. Section 107 Claims

"CERCLA, as amended by the Superfund Amendments and Reauthorization Act of 1986 (SARA), provides two legal avenues by which a private party can recoup some or all of the costs associated with an environmental cleanup: a cost recovery action under § 107(a) and a contribution action under § 113(f)(1)." *Bedford Affiliates v. Sills*, 156 F.3d 416, 423 (2d Cir.1998). Section 107(a) creates four groups of potentially responsible persons ("PRPs"): "(1) present owners and operators of facilities that accepted hazardous substances; (2) past owners and operators of such facilities; (3) generators of hazardous substances; and (4) certain transporters of hazardous substances." *Id.* (citing, *inter alia*, CERCLA § 107(a), 42 U.S.C. § 9607(a)). Section 107(b) exempts from liability those persons

> otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by—
>
> (1) an act of God;
>
> (2) an act of war;
>
> (3) an act or omission of a third party other than ... one whose act or omission occurs in connection with a contractual relationship, existing directly

or indirectly, with the defendant ... if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts and omissions of any such third party and the consequences that could foreseeably result from such acts or omissions; or

(4) any combination of the foregoing paragraphs.

42 U.S.C. § 9607(b). A PRP who does not establish entitlement to one of the § 107(b) defenses to liability cannot bring a Section 107(a) action and is relegated to a Section 113(f) action. *See Bedford Affiliates;* 156 F.3d at 423–24.

■ The first two § 107(b) defenses clearly do not apply to Nashua. However, even though Nashua admits responsibility for a limited area of contamination directly underneath the solvent recovery room, it argues that because the solvent recovery room contamination is divisible from Norton's contamination, Nashua is entitled to a Section 107(b)(3) defense. I disagree; the area in issue, as defined by Nashua's amended complaint, is the area underlying the entire Nashua facility, Am. Compl., Dkt. No. 108, ¶¶ 1, 6. Because Nashua conceded that it released hazardous substances to the ground underneath a portion of the Site, Nashua is a PRP and cannot maintain a Section 107 action. *See Bedford Affiliates,* 156 F.3d at 423–24.

*B. Section 113(f)(1) Claims*

■ To establish a Section 113(f)(1) contribution claim, Nashua must first establish a *prima facie* case under Section 107. *See id.* at 427. This task requires proof that "(1) [Norton] fits within one of the four classes of responsible parties enumerated in § 107; (2)[t]he [Nashua] site is a facility; (3)[t]here is a release or threatened release of hazardous substances at the facility; (4) [Nashua] incurred costs responding to the release or threatened

release; and (5)[t]he costs and response actions conform to the National Oil and Hazardous Substances contingency plan." *Id.* Norton as a past owner and a generator is a PRP. *See* 42 U.S.C. § 9607(a). CERCLA defines "facility" broadly as

(A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

42 U.S.C. § 9601(9). Under either (A) or (B), the Nashua site is a facility. Norton released massive amounts of toluene and tolusol into the soil and groundwater at the site. Hazardous substances under CERCLA include all substances designated by the EPA pursuant to 42 U.S.C. § 9602. *See B.F. Goodrich Co. v. Murtha,* 958 F.2d 1192, 1199–1200 (2d Cir.1992). If a mixture contains a hazardous substance, the mixture is also a hazardous substance. *See* id. at 1201. Toluene is a listed hazardous substance under CERCLA. *See* 40 C.F.R. § 302.4, Table. Because toluene is the major component of tolusol, it too is hazardous. The proof also establishes that Nashua incurred costs to respond to these hazardous substances. Norton does not seriously dispute any of these issues. Rather, Norton contends that none of the response costs should be apportioned to Norton because Norton's releases have long since dissipated; Nashua's response actions did not comply with the NCP; and Nashua's claimed costs are excessive and poorly defined.

■ "[A] CERCLA plaintiff is not required to prove its case with scientific certainty; a preponderance of the evidence is enough." *B.F. Goodrich v. Betkoski,* 99 F.3d 505, 526 (2d Cir.1996). Nashua's evidence more than satisfies this standard.

As discussed earlier, both Nashua and Norton contributed to the pollution at the Site, but Nashua's contribution is minimal compared to Norton's. I conclude that Nashua has made a *prima facie* case for cost recovery.

■ Section 113(f)(1) directs me to "allocate response costs among liable parties using such equitable factors as [I] determine[ ] are appropriate." 42 U.S.C. § 9613(f)(1). The Second Circuit has declined to compile a mandatory list of factors for consideration, leaving to the district court the task of deciding which discretionary factors to apply in light of the facts of a particular case. *See Bedford Affiliates,* 156 F.3d at 429.

I find eight factors relevant. First, by an order of many magnitudes, Norton contributed the major portion of the toxic substances released to the subsurface environment. Second, Norton apparently did nothing before January 1969 to ensure that its underground transfer lines were holding pressure despite the fact that these lines were a readily apparent source for the contamination noted within the Site and in neighboring areas. Third, although Norton's clean-up efforts may have been state-of-the art at the time, they were largely ineffective. Fourth, Norton did not disclose its massive leaks at the time of sale. Fifth, both Nashua and Norton are or have been owners of the Site. Sixth, Nashua contributed a very minor portion of the contamination at the Site. Seventh, upon discovering a significant amount of toluene in the Empire B–1 boring, Nashua did not immediately undertake clean-up efforts or notify appropriate environmental authorities.[8] Eighth, since notification by the EPA in 1989, Nashua's response has been appropriate. Based on these circumstances, I apportion both past response costs and future response costs 90% to Norton and 10% to Nashua. *Cf. Bedford Affiliates,* 156 F.3d at 430 (upholding allocation of 95% for generator of all hazardous waste and 5% for owner of property that generated none of the hazardous waste but delayed almost three years before contacting a government agency to begin cleanup). These percentage allocations apply to all past and future response costs in compliance with the NCP. Nashua' attorney's fees for this litigation are not recoverable under CERCLA. *See Bedford Affiliates,* 156 F.3d at 430.

Norton argues that notwithstanding its *prima facie* CERCLA liability, Nashua's response costs to date are not recoverable because they do not comply with the NCP. For the reasons that follow, I disagree and hold that Nashua may recover its costs.

The NCP gives "organizational structure and procedures for preparing for and responding to . . . releases of hazardous substances." 40 C.F.R. § 300.1. Action taken by a private party is " 'consistent with the NCP' if the action, when evaluated as a whole, is in substantial compliance with the applicable requirements . . . and results in a CERCLA-quality cleanup." § 300.700(c)(3)(i). In addition to ensuring a high-quality cleanup, the NCP's requirements prevent recovery for needlessly costly investigations. *See Lansford–Coaldale Joint Water Auth. v. Tonolli Corp.,* 4 F.3d 1209, 1219 (3d Cir.1993). A private party must show substantial compliance with the NCP before it can recover its cleanup costs from another party under CERCLA. *See* 40 C.F.R. § 300.700(c)(2), (c)(3)(i).[9]

■ Norton asserts that Nashua must demonstrate strict rather than substantial compliance with the NCP because the prevailing interpretation of the 1985 version of the NCP., *see* 50 Fed.Reg. 47912, codified at 40 C.F.R. § 300.61 *et seq.,* required

---

8. Nashua here relies on the legalistic argument that it believed Norton already had made all required reports and that there was no new spill. I view this argument as irrelevant to an equitable allocation in light of the clear danger that the solvent found in the B–1 boring represented to the environment.

9. Paragraphs five and six of the section specify which NCP requirements apply to private-party actions. *See* § 300.700(c)(5), (c)(6).

strict compliance, and Nashua incurred much of its costs before the 1990 version,[10] which requires only substantial compliance, took effect. I apply the substantial compliance standard for all costs incurred, whether before or after the 1990 version took effect, because I find that the 1990 revision merely clarified the existing standard of compliance, which earlier courts had misread. *See Reading Co. v. City of Philadelphia*, 823 F.Supp. 1218, 1239–40 (E.D.Pa.1993). Before 1990, many courts interpreted the NCP to require strict compliance. *See, e.g., Amland Properties Corp. v. Aluminum Co. of America*, 711 F.Supp. 784, 796 (D.N.J.1989); *Artesian Water Co. v. Government of New Castle County*, 659 F.Supp. 1269, 1295–96 (D.Del. 1987) *aff'd*, 851 F.2d 643 (3d Cir.1988). Those courts acted without the benefit of specific guidance, because the 1985 version of the NCP did not provide the legal standard of compliance. In 1990, the EPA set forth an explicit substantial compliance standard and explained that the revisions were intended "to clarify existing NCP language." 55 Fed.Reg. 8666 (March 8, 1990). Finding the EPA's interpretation not clearly erroneous, I give it controlling weight. *See Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).

Norton argues in the alternative that Nashua has not substantially complied with the NCP. Many of the NCP requirements cited by Norton do not apply, however, because Nashua is still at the preliminary remedial evaluation phase and has not yet selected a remedy nor assessed its feasibility. Norton's expert, Richard Bartelt, conceded as much at trial. TT at 4112–4113, 4119, 4123–4125. In addition, as Norton essentially admits, the NCP sets no explicit time limit on the initial investigatory phase. Although there must come a point when a party can no longer legitimately claim to be investigating a problem, the findings of fact concerning Nashua's investigation demonstrate that it has proceeded with reasonable diligence and has not yet reached the point where its efforts can no longer be considered investigatory. Accordingly, many of Norton's objections are premature and receive no further consideration here. I find that Norton's remaining objections lack merit.

■ Nashua has not yet completed a detailed risk assessment, but its failure to do at this preliminary stage of the investigation does not violate the NCP. *See Gache*, 813 F.Supp. at 1046 ("Obtaining preliminary information ... seems a necessary step before any further action can be properly taken."). Norton correctly observes that the NCP includes only those hazardous releases or threats of releases "which pose substantial danger to the public health or the environment." *See* 42 U.S.C. § 9605(a)(2). However, a private party need not conclusively determine, in advance of investigation, that a site poses a threat to public health or the environment serious enough to justify further action. In any event, as discussed below at 46–47, it is clear that the Site in question poses such a threat.

■ Norton also contends that Nashua's safety plan was inadequate. The NCP requires a worker health and safety plan before any cleanup activity commences. *See* 40 C.F.R. § 300.700(c)(5)(i) (incorporating the requirement of 40 C.F.R. § 300.150(a) that "[r]esponse actions under the NCP ... comply with the provisions for response action worker safety and health in 29 C.F.R. § 1910.120"). Section 1910.120 states that employers must have "a site-specific safety and health plan ... [at] each phase of site operation." 29 C.F.R. § 1910.120(b)(1), (b)(4). Norton points out that Nashua's plan did not include specific provisions for sewer sampling. Norton's criticism is accurate in that the health and safety plan Nashua employed states that it "does not address sewer sampling protocols." P–163. Nonetheless, after examination of the plan, I credit Williams' testimony that "there [were] specific details regarding different

---

10. For the 1990 version, see 55 Fed.Reg. 8666, codified at 40 C.F.R. § 300.1 *et. seq.*

types of sampling activities at the site ... [and] an explicit statement in the worker health and safety plan ... that it [was] to apply to all activities conducted at the site." TT at 1978. In addition, I accept Williams' testimony that Nashua "took extraordinary precautions during ... the sewer investigations to prevent ... workers ... from coming into contact with the contents of the sewers." *Id.; see also* TT at 1984–85. In short, Nashua drafted a worker health and safety plan to cover the entire cleanup investigation and, in fact, took adequate steps to ensure the safety of its workers during sewer investigations. Therefore, I find that Nashua substantially complied with the NCP, even though Nashua did not include the specifics of sewer sampling in the plan itself.

▓ Norton also alleges that Nashua did not develop a quality assurance project plan ("QAPP"), that its field sampling plan was inadequate, and that it failed to maintain adequate records. *See* 40 C.F.R. § 300.700(c)(5)(vii) (applying 40 C.F.R. § 300.420 planning requirements to private parties); 40 C.F.R. § 300.700(c)(5)(ii) (applying 40 C.F.R. § 300.160 documentation requirements to private parties). Section 300.420 provides that "[p]rior to conducting field sampling ... the [private party] shall develop sampling and analysis plans that ... provide a process for obtaining data of sufficient quality and quantity to satisfy data needs." § 300.420(4). The relevant set of plans must contain (1) a field sampling plan explaining "the number, type, and location of samples, and the type of analyses," and (2) a QAPP explaining "policy, organization, and functional activities and the data quality objectives and measures necessary to achieve adequate data for use in site evaluation and hazard ranking system activities." *Id.* at (4)(i), (4)(ii). The results obtained from activities undertaken under both plans must be well documented. *See* § 300.160 ("During all phases of response, [the private party] shall complete and maintain documentation to support all actions taken under the NCP and to form the basis for cost recovery.").

Williams testified that Nashua had extensive planning materials covering the subject matter of a QAPP and a field sampling plan. TT at 1988–89, 1992–93. He admitted, however, that there may have been no document actually labeled as a QAPP. TT at 1992–93. Norton argues that the field sampling plan was defective largely because it did not include the specifics of sewer sampling and soil gas surveying. Even though no document was designated a QAPP and the field sampling plan omitted discussion of sewer sampling and soil gas surveying, I find that Nashua adequately set forth sampling and analysis plans, conducted its investigation with a great deal of care, and adequately documented the investigation. TT at 1973–74, 1977–80, 1984–89, 1992–94, 2001. Accordingly, I find that Nashua substantially complied with the NCP.

Norton finally contends that Nashua's documentation does not support its claim for response costs in three respects: (1) prior to April 1992, Nashua did not segregate litigation costs from investigative costs; (2) after Nashua began to segregate investigative costs from litigation costs, it assigned as investigative costs many items that were pertinent to litigation; and (3) many invoices contain expenses that were either unreasonable or totally unjustified. Because Nashua can recover litigation costs under RCRA, its failure to segregate those costs becomes significant only if Nashua does not prevail on its RCRA claim. I therefore defer consideration of Nashua's first and second arguments for the RCRA portion of this opinion.

Although Norton claims that many of the Dunn/RUST invoices are unreasonable or undocumented, Nashua offered all the invoices at trial and Rick Lawton, a Nashua employee who worked with the environmental consultants testified that he reviewed the charges, verified that the work actually had been done, objected to charges that he felt were inappropriate, and divided costs between the investigation project and the litigation. TT at 880–

81. Lawton's testimony was taken over a period of two months. Therefore, Norton had ample opportunity to examine the invoices and ask for further explanation of any entries it believed to be unjustified. Based on these facts, I will presume the invoices to be reasonable and accurate unless Norton points to specific proof in the record—other than the invoices' failure to explain a specific charge—to support its contention that the invoices are unreasonable.

■ Norton complains that several invoices are unreasonable because individual employees worked more than twenty hours on a particular day. *See* Norton FOF 162 (Invoice 024147 dated July 12, 1990); Norton FOF 165 (Invoice 025161 dated November 11, 1990); Norton FOF 175 (Invoice 9592077, dated May 5, 1997). Although the hours these employees claim to have worked are unusual, they are not impossible. Absent proof that the employees did not work as long as they claimed, I decline to discredit the invoices. Norton also complains that Williams monitored a drilling on August 9, 1990, while another employee supervised the same drilling. Norton FOF 163. At trial, Lawton explained that Williams monitored soil conditions while the other employee supervised the actual drilling. TT at 1619–20. Therefore, I reject this objection. Norton next objects to Invoices 029699, 30750, 035880, 36724, and 37906 because they charge for work necessary to estimate scope of work and costs under RCRA. Norton FOFs 168, 169, 171, 172. Nashua gave no authority for including costs necessary to formulate a RCRA plan as CERCLA response costs. Therefore, I find that these invoices are unreasonable and should be deducted from the allowable response costs. Norton also objects to Invoice 9491747, dated June 30, 1994, because it covers a Phase I Environmental Audit, which Norton claims "is not conducted for site cleanup purposes." Norton FOF 174. Because Norton supplies no citation to the record or legal authority for this proposition, I reject it. Except for those costs specifically disallowed herein,

which total $16,448.74, I find all of Nashua's response costs to be reasonable. Nashua's total claimed costs are $219,544.47. P–229d. After deducting $16,448.74 in unreasonable costs, Nashua's allowable CERCLA response costs are $203,095.73. Norton must pay 90% of this amount or $182,786.15.

## II. RCRA Claims

On its RCRA claim, Nashua seeks injunctive relief directing Norton to participate in the Site investigation and clean up, an order directing Norton to pay the costs and expenses incurred by Nashua in connection with the Site to date, and an award of the costs of litigation. Am. Compl., Dkt. No. 108, at 16.

RCRA governs the treatment, storage and disposal of solid and hazardous waste. *See Meghrig v. K.F.C. Western, Inc.*, 516 U.S. 479, 483, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996). "Unlike [CERCLA], RCRA is not principally designed to effectuate the cleanup of toxic waste sites or to compensate those who have attended to the remediation of environmental hazards." *Id.* Nevertheless, to effectuate its primary goals of "reduc[ing] the generation of hazardous waste and ... ensur[ing] the proper treatment, storage, and disposal of that waste which is nonetheless generated," RCRA contains a private attorney general provision allowing law suits for injunctive relief. *Id.; see also* RCRA § 7002, 42 U.S.C. § 6972. Insofar as relevant to the facts of this case, RCRA grants a private right of action

> against any person ... including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an

imminent and substantial endangerment to health or the environment.

42 U.S.C. § 6972(a)(1)(B).

The district court has jurisdiction in such actions

to restrain any person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste referred to in paragraph (1)(B), to order such person to take such other action as may be necessary, or both, . . . .

42 U.S.C. § 6972(a).

Norton argues that (1) Nashua's claim properly is characterized only as a CERCLA claim because Nashua is acting on its own behalf rather than on behalf of the public generally; (2) Nashua failed to sustain its RCRA claim because it did not demonstrate "an imminent and substantial endangerment to health or the environment;" and (3) RCRA does not allow recovery of response costs.

### A. Propriety of a RCRA Claim

■ Norton argues that I should dismiss Nashua's RCRA claim as a transparent effort to circumvent CERCLA's relief limitations. Under CERCLA, a successful plaintiff is not entitled to injunctive relief and attorney's fees; RCRA allows these forms of relief. Because Nashua is a successor landowner rather than an innocent neighbor, Norton contends that it cannot fill the role of private attorney general envisioned by RCRA. To support this proposition, Norton relies on *Fallowfield Dev. Corp. v. Strunk*, 1993 WL 157723 (E.D.Pa.1993). Although the court in *Fallowfield* denied any RCRA relief to the successor landowner plaintiff, it explicitly found that the successor landowner had prevailed on its RCRA claim. *See id.* at *14. Therefore, even if I were to adopt the reasoning of *Fallowfield*, it would not bar Nashua's RCRA claim. The statute itself does not bar successor landowners—even those who bear some responsibility for contamination—from bringing a RCRA claim. Instead, it states broadly that "any

person" may commence a RCRA lawsuit. 42 U.S.C § 6972(a). Therefore, I find that Nashua appropriately pursued a RCRA claim.

### B. Imminent Danger

■ However, in order to succeed on its RCRA claim, Nashua must show "that the solid or hazardous waste at issue 'may present an imminent and substantial endangerment to health or the environment.'" *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 485, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996) (quoting 42 U.S.C. § 6972(a)(1)(B)). Although this requirement has not been extensively fleshed out, certain principles are clear.

A finding of 'imminency' does not require a showing that actual harm will occur immediately so long as the risk of threatened harm is present: An imminent hazard may be declared at any point in a chain of events which may ultimately result in harm to the public. Imminence refers to the nature of the threat rather than identification of the time when the endangerment initially arose . . . . In addition, a finding that an activity may present an imminent and substantial endangerment does not require actual harm.

*Dague v. City of Burlington*, 935 F.2d 1343, 1356 (2d Cir.1991) (internal quotation marks and citations omitted), *rev'd in part on other grounds*, 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992). Nonetheless, imminent and substantial danger does not exist when the pollution at the site has been remedied or does not present a danger due to a barrier that prevents contaminants from escaping. *See Meghrig*, 516 U.S. at 485–86, 116 S.Ct. 1251 (holding RCRA not available where risk of imminent danger has been removed); *Price v. United States Navy*, 39 F.3d 1011, 1019 (9th Cir.1994) (holding that plaintiffs failed to show imminent endangerment where experts testified that concrete barrier would prevent contaminants from entering plaintiffs' house and plaintiffs failed to con-

vince court that level of contaminants below the house was hazardous).

I have found that contamination from two hazardous chemicals persists at the Site, and there is no barrier that prevents this contamination from causing harm to the environment or health on or off the Site. Nevertheless, Norton argues that Nashua failed to establish that the toluene and heptane present at the site "may present an imminent and substantial endangerment to health or the environment." I disagree. In light of the magnitude of Norton's leaks, the persuasive testimony by Nashua's experts concerning the persistence of toluene and heptane in the subsurface environment, the confirmed presence of substantial remnants from Norton's leaks in both the groundwater and the soil, and the reasonably close proximity of at least two of the contaminated wells (DGC–7 and DGC–8) to a residential neighborhood, Nashua established that contaminants are present on the Site, likely are present off-Site, and "may present an imminent and substantial endangerment to the health or the environment." This conclusion conforms with the conclusion reached by Luanne Whitbeck, a supervising engineering geologist with DEC, who supervised the Nashua investigation. TT at 738–39. She testified that the Nashua contamination presented "imminent danger to human health and the environment" based on the subsurface contamination that she had reason to believe had spread off site.[11] TT at 790–91. Therefore, Nashua established the "imminent endangerment" element of its RCRA claim.

## C. Cost Recovery Under RCRA

 *Meghrig* established that RCRA does not "authorize[ ] a private cause of action to recover the prior cost of cleaning up toxic waste that does not, at the time of suit, continue to pose an endangerment to health or the environment." *Id.,* 516 U.S. at 481, 116 S.Ct. 1251. Nashua argues that *Meghrig* does not bar its recovery of response costs incurred after it commenced its RCRA claim and while a substantial risk to the environment or health persisted. Although the *Meghrig* holding does not bar Nashua's RCRA response costs claim, *see id.* at 488, 116 S.Ct. 1251, both its reasoning and the statutory language indicate that a private plaintiff cannot recover past response costs in a RCRA action.

As noted previously, Section 7002(a) of RCRA authorizes the district court "to restrain any person" who is liable under the statute or "order such person to take such other action as may be necessary." 42 U.S.C. § 6972(a). Section 7002(a)(1)(B) contains no mention of damages or reimbursement of response costs. To avoid this remedial limitation, Kentucky Fried Chicken, the plaintiff in *Meghrig,* characterized its response costs as "equitable restitution" and argued that they were recoverable as equitable relief pursuant to Section 7002(a).[12] *See id.* at 482, 116 S.Ct. 1251. The Supreme Court rejected this argument for several reasons. First, the Court found that the plain language of Section 7002(a)(1)(B) and the contrast between the remedial provisions of CERCLA, which clearly authorize an action for recovery of response costs, and the RCRA provisions, which do not, indicates that Congress intended no such recovery under RCRA. *See id.* at 485, 116 S.Ct. 1251. The Court said, "Congress ... demonstrated in CERCLA that it knew how to provide for the recovery of cleanup costs, and ... the language used to define the remedies under RCRA does not provide that remedy."

---

11. Norton argues based on four negative soil gas results just north of the Site, that there is no off-site contamination. I disagree. The small number and limited locations of the off-Site soil gas samples does not support so sweeping a conclusion in light of the massive Norton discharge and the clear evidence that it spread far north of the Site and resulted in two off-site deaths.

12. KFC could not bring a CERCLA claim because CERCLA excludes petroleum, the contaminant at issue. *See id.* at 485, 116 S.Ct. 1251.

*Id.* at 485, 116 S.Ct. 1251. Second, the Court noted that RCRA provided relief only if there was showing of a possible imminent and substantial endangerment to health and welfare, something that is impossible if a site has already been cleaned. *See id.* at 486, 116 S.Ct. 1251. Finally, the Court found that RCRA's failure to set a statute of limitations for damages claims or any standard by which to judge the reasonableness of its response costs both sharply contrasted with the response costs provisions of CERCLA and suggested that Congress did not intend RCRA to function as a cost recovery plan for private agents. *See id.*

Nashua seizes on two aspects of *Meghrig* to distinguish it: *(1) Meghrig* addressed clean up costs whereas Nashua seeks reimbursement for investigative costs and (2) unlike Kentucky Fried Chicken, Nashua filed its lawsuit while an imminent danger to health and the environment still existed. The first argument rests on the slender reed of *Meghrig's* mention that RCRA, unlike CERCLA, lacks a requirement that clean-up costs comply with the NCP. *See Meghrig,* 516 U.S. at 486, 116 S.Ct. 1251. Nashua reasons that because investigative costs under CERCLA need not comply with the NCP, investigative costs should be reimbursable under RCRA. This argument overlooks the most powerful basis for the *Meghrig* opinion— the statutory language. Section 7002(a) simply cannot be read to allow an award of damages, whether for investigative costs incurred or clean up costs incurred. Nashua's second argument suffers from the same pinched vision; it ignores the statutory analysis portion of the *Meghrig* opinion. I therefore must dismiss Nashua's claims for past response costs— whether characterized as investigative costs or clean up costs—under RCRA. *See Avondale Fed. Sav. Bank v. Amoco Oil Co.,* 170 F.3d 692, 694 (7th Cir.) (rejecting argument that *Meghrig* and RCRA can be interpreted to allow recovery of clean up costs incurred after suit has commenced), *cert. denied,* —— U.S. ——, 120 S.Ct. 284, 145 L.Ed.2d 238 (1999).

### D. Injunctive Relief

■ Norton argues that Nashua did not establish entitlement to injunctive relief because it did not show irreparable harm and has an adequate remedy at law, i.e. its CERCLA contribution remedy. "[I]njunctive relief does not follow automatically upon a finding of statutory violations, including environmental violations." *Town of Huntington v. Marsh,* 884 F.2d 648, 651 (2d Cir.1989). The plaintiff must, in addition, show irreparable injury and the inadequacy of legal remedies. *See id.* If injury to the environment is sufficiently probable, "the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co. v. Village of Gambell,* 480 U.S. 531, 545, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). I have already determined that Norton's leaks pose a potential danger to the Site and its neighbors. By the very nature of a RCRA investigation of a large site, it is impossible to determine at this juncture just how probable that harm is. Based on the expert testimony of likely additional contamination on and off site, I consider it likely enough to justify the imposition of limited injunctive relief.

However, this is not a case in which it makes sense to order Norton to take over the clean up of the site. Nashua is in possession of the site, already has commenced an investigation, and is not entirely blameless. Nevertheless, Nashua's CERCLA contribution remedy is not adequate to ensure the prompt completion of site investigation and clean up. Even with a declaration that Norton must fund 90% of clean up costs, Norton—which already has shown a willingness to fight costs and liability on thin grounds—can belatedly question clean-up costs and decline to pay them without court intervention. Although Norton needs protection from paying future costs that do not comply with the NCP, this protection should not become a device to avoid prompt payment and consequently prompt removal of any threat to health or the environment.

Therefore, I envision entry of an injunction that orders Norton to pay 90% of all future clean up and investigative costs unless it files specific objections to a particular bill within a certain period of time. In order to ensure speedy clean-up of the Site, Norton should be required to maintain some sort of on-Site presence. In this way, Norton can have immediate input into decisions that must be made quickly although Nashua will retain overall responsibility for Site clean-up. Norton should also participate in the clean-up to the extent practicable.

Because the terms of such an injunction are best arrived at after considering the input of the parties, I refer this issue to Magistrate Judge Ralph W. Smith, Jr., for a report-recommendation on the terms of an injunction that will assure that Nashua fully informs Norton of all future work plans; Norton lodges any objection to the contemplated scope of work within a reasonable period of time or loses its right to object absent fraud on Nashua's part; Norton receives copies of all invoices on a prompt basis and must object to them within a reasonable period of time or lose its right to object; Norton maintains an on-Site presence and cooperates with and/or assists in the clean-up; and a mechanism is provided for resolving objections. The injunction should also protect Norton and the Site clean-up by allowing Norton sufficient access to both the Site and pertinent documentation to allow it to make prompt and knowledgeable objections. Finally, the Magistrate Judge should determine whether it is practicable to include provisions in the injunction that give both parties an incentive to achieve a speedy and cooperative clean-up. I ask that within 30 days of the date this order is filed, Magistrate Judge Smith issue an order establishing a timetable for whatever submissions he believes will be helpful in formulating his report-recommendation. The primary criterion in determining the terms of the proposed injunction should be the prompt restoration of this site to a state in which it does not pose a threat to health or to the environment.

### E. Attorney's Fees

 RCRA authorizes payment of a reasonable attorney's fee "to the prevailing party or substantially prevailing party, whenever the court determines such an award is appropriate." 42 U.S.C. § 6972(e). To earn an award of attorney's fees, Nashua "must receive at least some relief on the merits of [its] claim." *Dague*, 935 F.2d at 1357 (internal quotation marks omitted). Nashua will receive substantial relief on its RCRA claim, i.e. an injunction requiring Norton to submit timely objections to Nashua's clean up costs or waive those objections and to maintain a presence on the site and assist in and cooperate with the clean-up to the extent practicable. Therefore, Nashua meets the prevailing party test and must now establish the reasonableness of its attorney's fees and other litigation costs. I refer this matter also to the magistrate judge for a report-recommendation.

Awarding Nashua its reasonable attorney's fees and other litigation costs moots Norton's complaints about Nashua's allocation of invoices between investigative and litigation costs. Norton stands to benefit from any invoices that Nashua wrongly allocated to investigation because it will have to pay only 90% of these invoices rather than the 100% figure attributable to reasonable litigation costs. Therefore, I see no need to disturb the allocation Nashua urges.

### CONCLUSIONS OF LAW

Based on the facts as found and the legal analysis set out above, I make the following conclusions of law.

### CERCLA

(1) Nashua's claims pursuant to § 107 of CERCLA should be dismissed because Nashua, a successor landowner that is not eligible for any of the § 107(b) defenses, cannot maintain a § 107 action against Norton.

(2) Nashua is entitled to maintain a § 113 contribution action against Norton

because (a) Norton is a potentially responsible party both as a former owner of the site and as a generator of toluene and Tolusol, (b) toluene and Tolusol are hazardous wastes, (c) the Site is a facility, (d) Norton released toluene and Tolusol at the Site, and (e) Nashua incurred response costs that complied with the NCP.

(3) The appropriate allocation of response costs pursuant to 42 U.S.C. § 9613(f)(1) is 90% Norton and 10% Nashua.

(4) Nashua's reasonable response costs through the date of trial total $203,095.73, and Nashua is entitled to entry of judgment in its favor and against Norton for 90% of that amount or $182,786.15.

(5) Norton is entitled to a declaratory judgment that Norton must pay 90% of all future response costs that are reasonable, necessary, and comply with the NCP.

(6) Nashua is not entitled to recover attorney's or expert fees for this litigation under CERCLA.

## RCRA

(7) Nashua properly maintained this lawsuit as a RCRA action because Norton, a past owner of the Site, generated hazardous waste that may present a substantial and imminent endangerment to health or the environment.

(8) Nashua is not entitled to recover its past response costs under RCRA.

(9) Nashua is entitled to the entry of an injunction that requires Norton to promptly lodge objections to proposed response plans and to submitted invoices or to waive those objections and to promptly pay response costs in the proportion determined above; to maintain a presence on the Site; and to assist in or cooperate with the clean-up to the extent practicable. This issue should be referred to Magistrate Judge Ralph W. Smith, Jr., for a report-recommendation on the terms of such an injunction.

(10) Nashua is entitled to reasonable attorney's fees for litigating its RCRA claims. This matter also should be referred to Magistrate Judge Ralph W. Smith, Jr., for report-recommendation.

IT IS THEREFORE ORDERED that the Clerk enter judgment in favor of Nashua and against Norton for Nashua's CERCLA response costs through the last date of trial in the amount of $182,786.15; and it is further

ORDERED that the clerk enter a declaratory judgment that Norton is responsible for 90% of Nashua's future response costs that are necessary and reasonable and comply with the NCP; and it is further

ORDERED that this matter is referred to Magistrate Judge Ralph W. Smith, Jr., for a report recommendation on (a) the amount of RCRA attorney's fees to be paid by Norton to Nashua and (b) the terms of an injunction that will be issued to insure the prompt clean up of the Site as discussed in this opinion.

IT IS SO ORDERED.

## APPENDIX I
## p-245: SAMPLE LOCATIONS
## AND AREAS OF POTENTIAL RELEASES

# APPENDIX II
## P-246: GROUND WATER ANALYTICAL RESULTS

# APPENDIX III
## P-247: SEWER ANALYTICAL RESULTS

# APPENDIX IV
## P-248: SOIL AND SOIL GAS ANALYTICAL RESULTS

# APPENDIX V

## P-250: MAP OF THE SITE AND ITS NEIGHBORS

## APPENDIX VI

### FREQUENTLY USED ABBREVIATIONS

DGC— Dunn/RUST identifier for various wells used in assessing groundwater contamination and water flow direction.

LNAPL— light non-aqueous phase liquid.

MEK— methyl ethyl ketone.

MH–FC— a manhole located on the sanitary sewer leading from the Bear–Tex Premises.

MIBK— methyl isobutyl ketone.

NAPL— non-aqueous phase liquid.

TB— Dunn/RUST abbreviation for test boring.

VOC— volatile organic compound